Ruffin, C. J.
 

 Upon the question of fraud we think it only necessary to remark, that it seems singular, that it should have been left to the jury, without laying the proper stress on the long continued possession of the father after making the deed, as a circumstance tending to show that the conveyance was upon a secret trust for the father, and especially as being deceptive to creditors by keeping up a false credit for the father. But although
 
 *389
 
 the possession is not further adverted to as an element of fraud, avoiding the plaintiff’s title, yet it is material, perhaps, on the other point, made at the trial, as to the plaintiff’s right to bring replevin.
 

 The old authorities all agree, that goods taken in execution from a Court of record are not repleviable. Com. Dig.
 
 Replevin,
 
 D. Indeed, the sheriff subjects himself to an attachment by making replevin of them.
 
 Bul.
 
 IV.
 
 P.
 
 53. The same law holds of warrants of distress on convictions, and process of execution on judgments given by magistrates, having jurisdiction.
 
 Rex
 
 v.
 
 Monkhead, 2
 
 Str. 1184.
 
 Wilson
 
 v.
 
 Miller,
 
 1 Brod. & Bing. 57. The reasons for this are of that imperative nature, that make the rule indispensable to the administration of the law. Execution has been called the end of the law. But it will be only the beginning, and there would be no end of the law, if after a person has established his right by judgment, the defendant’s effects may be rescued from the execution at his will by suing out a writ of replevin. No ease is found in England of replevin maintained by any person for goods, taken by virtue of an execution against the plaintiff in replevin or any/>ther person. In New York it was held in
 
 Thompson
 
 v.
 
 Button,
 
 14 John. 84, that goods of A. taken out of the possession of A. upon execution against the property of B. may be repieveid at the suit of A. but no authority was cited for the position, and the decision put expressly on the ground, that, by taking goods out of the possession of one person, upon execution against another, the officer undertakes to show, that they were the property of'the defendant, in the execution; and the Court explicitly states the general pinciple, that goods taken in execution are in
 
 custodia legis,
 
 and “ it would be repugnant to sound principles to permit them to be taken out of such custody, when the officer found them in and took them out of the possession of the defendant in execution.” It is true
 
 *390
 
 that a contrary rule is laid down by one of the Judges in
 
 Clark
 
 v.
 
 Skinner,
 
 20 John. 465, who held the broad doctrine, that the principle only applied between the officer and the defendant in execution, and that a third person might replevy on his right of property, although the seizure was made while the thing was in the debtor’s possession, provided only the plaintiff in replevin had the right to take possession, when the officer took it. That opinion was then extra-judicial, as the case was, that the officer took the things from the possession of the plaintiff’s servant, while employed in his master’s business, upon an execution against the servant. Therefore the actual possession, in a legal sense, was in the master and not the servant ; and the former might have had trespass as well as trover for the taking, and on that ground the majority of the Judges rested their decision. Subsequently, indeed, the broader doctrine gained favour, and in the case of
 
 Dunham
 
 v.
 
 Wicks,
 
 3 Wend. 280 it, was held by the Supreme Court, that every person, having the property, in goods and the right to reduce them to possession, may have the action against an officer, who takes them by execution out of the actual possession of the defendant in execution, notwithstanding an express recognition of the contrary doctrine by the same Court just one year before in
 
 Judd
 
 v.
 
 Fox, 9
 
 Cowen 259. it may therefore, we suppose, be considered settled in that State. The extension of this action to the case, where one man’s goods are taken upon execution against another, prevails also in Massachusetts ; but upon much more legitimate grounds, than those on which it has been placed in New York. By a statute of 1789 it was there enacted, when any goods, of the value of more than
 
 $20,
 
 which are attached on mesne process, or taken in execution, are claimed by any person, other than the defendant in the suit, in which they are so taken or attached, such owner or other person may cause them to be replevied. It may be remarked
 
 *391
 
 that the very passing of that act is inconsistent with the idea, that the common law gave the action in such cases; and Chief Justice Parsoxs lays it down clearly, that it did not,
 
 Ilsley
 
 v.
 
 Stubbs, 5
 
 Mass. Rep. 280. But after the act, the Courts in Massachsetts were obliged to sustain the action ; for, although, the Chief Justice could not help remarking, the alteration of the common law had been productive of much practical inconvenience, yet it rested with the legislature to decide whether the common law should or should not be restored. With this declaration of the opinion and experience of a Judge, so learned and wise, before us, there ought to be little inclination to depart from the common law further than compelled by legislative authority. Accordingly in this State it was held, that the action of replevin would only lie by the common law, for a taking of goods from the possession of the plaintiff, and not upon a finding, though the owner was entitled to the immediate possession,
 
 Cummings
 
 v.
 
 McGill,
 
 No. Ca. T. R. 98. Therefore at common law we should hold, that this action would not lie, both because the goods, when taken, were not, legally, in the possession of the plaintiff, but actually in that of his father, not as his son’s servant, and because the taking was by virtue of an execution against the property of the possessor.
 

 It is contended, however, for the plaintiff, that the common law is altered here also by statute, as respects slaves, and that he is now entitled to the action. The act is that of 1828, Rev. St. ch. 101, and enacts, that writs of replevin for slaves shall be held and deemed to be sustainable against persons in possession of such slaves, in all cases where actions of detinue or trover are proper; provided, the plaintiff shall make oath, that he had been in the lawful possession of the slaves within two years preceding the issuing of the writ, and that he has been deprived of such posssession without his per*
 
 *392
 
 mission or consent. Then follow various provisions with respect to the plaintiff’s giving bond for the return of the slave, and for the defendant’s giving bond for the performance of the judgment, if he chooses to keep possession during the suit. It is then enacted, that in case the plaintiff recover, the jury shall assess the value of the slave and the damages for the taking and detention, and that there shall be judgment for the value (to be discharged by the surrender of the slave, when kept by the defendant) and for double the damages assessed ; and when not kept by the defendant, then for the double damages, and costs ; and when the possession is delivered to the plaintiff, and the verdict is for the defendant, that then the damages, sustained by the defendant from being deprived of his property shall be assessed and judgment rendered therefor and the costs, against the plaintiff' and his sureties. Such are the provisions of the act; and the argument is, that detinue or trover would be proper here, and therefore replevin will lie. The conclusion is not exactly logical: for in coming to it one loses sight of the proviso. That restrains the generality of the enacting clause, and by a necessary construction gives the action only when detinue or trover would lie for such an owner of a slave, as had been in lawful possession within two years before suit, and had been deprived of such possession without his consent. The action is still founded on an injury done to the possessor of a slave, though that injury need not be by “ taking” out of the owner’s actual possession, but may be by finding or enticement and then keeping the slave from him. It might therefore be well questioned, whether the plaintiff might not have been barred of his action, upon the ground, that his father, and not he, had the possession independent of the authority under which the defendant acted. But however that may be, and it is not necessary here to say, the Court is clearly of opinion, that it cannot be maintained upon a
 
 *393
 
 taking under execution from the actual possession of the defendant in execution. The enacting words cannot be received in their full latitude, as that would produce the absurdity of allowing the debtor himself to bring replevin against the officer, because he might sue in trover. True, the act does not absolutely replevy the goods, but the defendant may retain them by giving bond. But the bond is to answer the judgment which is very severe, being not only for the slave or the value, and costs, but for double damages. Now the legislature could never have intended, that an officer, who acts on oath and is presumed to intend to act honestly and legally, should, by reason of some unobserved defect in process, be made liable beyond the actual damages arising from his acts. We may assume it certain then, that it was not meant thus by a side wind to prostrate the efficiency of final process, and to make the officer liable for extraordinary and arbitrary damages for an act, as he supposed, in the discharge of his duty. Therefore although the words be thus large, we conclude that the legislature did not intend, either that the defendant in execution might by this means regain the possession of his property, or subject the officer to such penalties, if by chance the process should prove defective, and to that extent, at least, the sense of the words must necessarily be limited. The same reasons operate with much the same force, when goods are taken on execution against one, to prevent another from having this action ; and there are some in addition, arising out of the interest of the defendant in execution. Suppose A. and B. to have adverse claims to a slave in the possession of A. and the sheriff to take him under an execution against A. it cannot be conceived that the legislature meant that B. (although he may have been in possession within two years) should have reple-vin against the sheriff, in order to try the title between him and A., as the action is regulated by the statute,
 
 *394
 
 rather than in the ordinary and adequate way by detinue, or trover, against A., or the sheriff, or the purchaser. The mischiefs of such a construction are so numerous and obvious, as to preclude it, unless absolutely forced on the Courts by the words and spirit of the act united. If the negro were delivered to the plaintiff in replevin, then the defendant in the execution would have his services during the period of litigation, and would have an uncertain and circuitous remedy for the damages sustained by him, supposing the title to be found for him. But if the sheriff gave bond and retained the slave, as perhaps after seizing he would become bound to do, the consequences would be still worse ; for if the title were found for the plaintiff in replevin, he would get double damages, although the sheriff dare not, during the whole time, put the slave to work, and could not get any thing for maintaining him, while he .kept him; and if the title were found against the plaintiff, yet the defendant in the execution and the true owner must have the services of the slave during the period and also pay for his maintenance or the sheriff keep him for nothing, after the day, on which he might have been sold,had there been no replevin. In the same manner, if a slave be attached, it is very certain that the former convenient and direct method of trying the title, by interpleading, will no longer be resorted to, when by replevin the plaintiff can get immediate possession or double damages against the officer. In every respect then the inconvenience of sustaining the action against an officer acting under legal process are so great as to satisfy the mind, that the act was passed
 
 divero intuitu,
 
 and that its proper construction will prevent its application to such cases. That is rendered yet more manifest by attending to the state of the law here in respect of this action, as lying against other persons, besides officers,and the reasons assigned in the preamble of the original act for passing it. They are, that slaves are fre
 
 *395
 
 quently
 
 seduced
 
 from the possession of their owners, under a pretence of right, by persons who were insolvent and intended to convey them beyond the jurisdiction of the Courts of this State, whereby great injury was produced to the
 
 bona fide
 
 holders of slaves, as the writs of sequestration, issuing from Courts of Equity in such cases, were tedious, expensive and frequently ineffectual; therefore it was enacted, that replevin may be sustained for slaves, where detinue or trover, were then proper. Detinue and trover were not effectual remedies in such cases, as those recited in the preamble, as the defendant was only held to bail, and might carry the slaves where he would, and upon judgment against him the only redress was against his body, and that would, probably, not produce satisfaction. It has already been noticed, that it had then recently been decided in
 
 Cummings
 
 v. McGill, that replevin would lie only on a
 
 taking
 
 from the owner, and not where the possession was obtained by'finding, or, consequently, by seduction. It is also known, that'many cases occurred of great hardship, where owners were defeated of the property, by dishonest and insolvent men seducing slaves and carrying them out of the State after having given bail. It was therefore manifestly proper and necessary to the purposes of justice, that, in such cases, notwithstanding the
 
 mode of getting possession,
 
 a remedy should be given in the common law Courts, whereby the owner could be better secured of regaining the slave, taken or seduced from him, or of recovering the value and exemplary damages. That such was the object of the act is to be inferred, too, from the provision, that, in case the plaintiff fail in the action, he is liable for only actual damages to the defendant, while, if the result of the suit be different, the defendant is made liable for double damages, no doubt for the reason of the unfairness of the means, whereby he obtained his possession. The object of the act was really then to give the
 
 *396
 
 action, where it would not lie before, by reason, merely, of the mode by which the defendant got possession: and in sustaining the action in the cases of possession gained by “ seduction,” as well as by “ taking,” the whole purpose of the act is fulfilled, without extending, it, so as to embrace cases, in which the action was held not to lie by reason, that the goods though “taken” were taken under process. It was not intended to interfere with the law as it withheld the action,
 
 on the ground of the authority,
 
 under which the defendant got possession. Eor example ; the action would not lie at common law, when the defendant came into possession by bailment from the plaintiff, though he may improperly refuse to return the goods,
 
 Galloway
 
 v. Bird, 4 Bing : 299; and the act did not intend to alter that; for it is express, that the plaintiff must have been deprived of the possession without his permission or consent. So it was not intended to interfere
 
 with the authority of the law itself
 
 to its officer, to seize the property in execution. That was not within the grievance cotemplated by the legislature ; and therefore the Court holds, that the action will not lie against the defendant, and the judgment must be reversed and a
 
 venire de novo
 
 awarded.
 

 Per Curiam. Judgment reversed and
 
 venire de nove,